AREBA SCHOOL CORPORATION, PLAINTIFF-APPELLANT, v. MAYOR AND COUNCIL OF THE TP. OF RANDOLPH, J. PETER BRAUN, ADMINISTRATOR, MICKEY SPILLANE, BUILDING INSPECTOR AND ADRIAN HUMBERT, ZONING OFFICER, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 3, 1977—Decided July 11, 1977.

Before Judges Halpern, Allcorn and Botter.

*Mr. Herbert A. Vogel* argued the cause for appellant (*Messrs. Vogel, Chait & Wacks,* attorneys).

*Mr. James M. Kenihan* argued the cause for respondents (*Messrs. Kenihan & Cohen,* attorneys; *Lawrence P. Cohen,* on the brief).

The opinion of the court was delivered by

Botter, J. A. D. The issue on this appeal is whether, contrary to the holding of the trial judge, Areba School Corporation (hereinafter Areba or the Areba School) is a "school or other education institution * * *"[1] within the meaning of the zoning ordinance of Randolph Township prior to its amendment during the course of this litigation. Areba has been approved by the New Jersey Department of Education as a nonprofit corporation authorized to operate a school for emotionally disturbed children with special education funding to be provided under *N. J. S. A.* 18A:46-1 *et seq.* Room and board for each pupil referred by a local board of education will be paid by the New Jersey Division of Youth and Family Services (DYFS), Department of Institutions and Agencies, pursuant to contract entered into with Areba.

Areba planned to commence operations on March 1, 1976 but was prevented from doing so by defendants on the theory that the use was prohibited by the municipal zoning ordi-

---

[1] The property is located in the RT-1 zone, in the Mt. Freedom section of Randolph Township, which is a resort zone in which a resort hotel complex had been converted to a college preparatory school with Junior R.O.T.C. status known as the General Douglas McArthur Military Academy and as the General Douglas McArthur Institute, which was in operation until mid-1975. A permitted use in this zone was: "A school or other education institution, including playgrounds, parks and accessory buildings, not conducted as a business."

nance. This action was instituted in April 1976 and a plenary trial was held in July and August 1976. Judgment was entered in favor of defendant township on August 4, 1976 denying relief to plaintiff. Plaintiff had sought an order preventing defendants from interfering with plaintiff's rightful use and occupation of the premises it had leased for the described purposes. The trial judge did find that if the Areba School is an educational institution within the meaning of the zoning ordinance, it could continue such educational activity on the premises as a valid nonconforming use despite the amendment to the zoning ordinance which sought to preclude the operation or maintenance of a school or educational institution in this zone. Defendants have not filed a cross-appeal from the determination of the trial judge on the nonconforming use aspect of the case.

Plaintiff sought to commence operation of this residential institution for emotionally disturbed children between the ages of 12 and 18. Dr. Angelo J. Spinazzola, Executive Administrator of the Areba School and Assistant Professor of Special Education at Jersey City State College, testified that the institution would provide academic, vocational and career training, and, on occasion, college-supervised independent study for its students. An accompanying therapeutic program was designed to modify the emotional, behavioral and attitudinal characteristics of the pupils to enhance their ability to learn. Dr. Irwin A. Hyman, Professor of School Psychology at Temple University and formerly the Chief of Clinical Services at the training school for retarded children in Vineland, testified that a therapeutic educational program for emotionally disturbed children cannot be divided into separate therapeutic and educational components since therapy is a concomitant process designed to remove emotional blocks which inhibit learning.

In December 1975 the Areba School had been listed by the Department of Education as a nonpublic school eligible for the 1975-1976 school year to receive a maximum of 16 emotionally disturbed children from New Jersey public

schools. Each local board of education sending a child to Areba would pay $480 in tuition on his behalf. In early 1976 Areba's budget, facilities and proposed program were approved by DYFS, which agreed to pay $457 a month for the room and board of each child in 1975-76. Robert Nicholas, Acting Chief of the Bureau of Residential Services of DYFS, testified that the Areba School provided an educational program and staff which met DYFS standards.

Dr. Spinazzola testified that each child would take part in daily school activities from 9 A.M. to 3 P.M. under the supervision of special education teachers. Individual therapy and group therapy sessions would be held three and five times a week, respectively. Except during the summer, each child would receive four hours of classroom instruction daily. During a two-week indoctrination period a child would attend classes while a child study team prepared an appropriate academic and residential prescription. After developing responsible attitudes the child would be allowed to leave the premises to engage in outside social and recreational activities. Upon graduating from the Areba School the child would receive a diploma from the local sending district.

New Jersey's public school system is designed to provide programs for handicapped children, including the emotionally disturbed, educable child. *N. J. S. A.* 18A:46-1 *et seq.; N. J. S. A.* 18A:7A-5(e). *N. J. A. C.* 6:28-2.1 defines an emotionally disturbed educable child as follows:

A child shall be considered to be emotionally disturbed when his behavior is characterized by a pattern of functioning which is so inappropriate as to call attention to itself and which severely limits the individual from profiting from regular classroom learning experiences or severely hinders other pupils in the class from profiting from regular classroom learning experiences. The emotionally disturbed child further characterizes himself by a pattern of expression of emotion inappropriate to the situation in a matter of degree and quality. However, the emotionally disturbed child must give evidence of a degree of rational behavior which permits some communication with authority figures indicative of ability to profit from instruction under specially controlled circumstances.

Emotionally disturbed and other handicapped children who cannot be accommodated by usual school facilities are to be identified . and classified by the local board's child study team. This team consists of a school psychologist, a learning disabilities specialist and a school social worker, and, where emotional disturbance is evident, a child psychiatrist. *N. J. S. A.* 18A:46–6; *N. J. S. A.* 18A:46–8; *N. J. A. C.* 6:28–2.1(b); *N. J. A. C.* 6:28–1.3(a) and *N. J. A. C.* 6:28–2.1, subsection (2) under the defintion of "emotionally disturbed."

James Richardson, Director of the Bureau of Special Education and Pupil Personnel of the Department of Education, testified below. He is responsible for all special education programs in the public schools and in eligible nonpublic schools for handicapped children in our State. He testified that the child study team develops an "educational plan" for the handicapped child. These plans range from supplementary education in the local school to enrollment in an eligible nonpublic school. *N. J. S. A.* 18A:46–13 in part states:

The absence or unavailability of a special class facility in any district shall not be construed as relieving a board of education of the responsibility for providing education for any child who qualifies under this chapter.

Placement of an emotionally disturbed child in a day or residential nonpublic school depends upon the child's home environment and the parents' consent.[2]

"The nonpublic school educational program shall be considered the educational program of the local school district * * *." *N. J. A. C.* 6:28–3.28(a). These programs for emotionally disturbed children provide smaller classes and spe-

---

[2]According to Director Richardson, of 5,000 or so school-age emotionally disturbed children from local districts, about 2,000 are enrolled in private facilities in New Jersey and 1,600 in out-of-state facilities.

cially trained teachers eligible for certification as if they were public school staff. *N. J. A. C.* 6:28–3.27. The local boards of education pay tuition, *N. J. S. A.* 18A:46–21; *N. J. A. C.* 6:28–3.24(b), "not to exceed the maximum tuition cost figure established by the State Board of Education for the school year considered * * *" (*id.*), conditioned in most circumstances upon academic instruction of at least four hours each day. *N. J. A. C.* 6:28–3.18(b)(1). A handicapped child who successfully completes the prescribed secondary educational program "shall receive the secondary school diploma of the local district." *N. J. A. C.* 6:28–3.7.

The trial judge's finding that the Areba School was primarily a therapeutic community with merely an ancillary educational component, and therefore that Areba is not an educational institution for the pertinent zoning purposes, is clearly erroneous. The goal of the Areba School is to educate and graduate children so that they may function in our society. New Jersey's constitutional guarantee of a thorough and efficient education for all its school children "must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child in his role as a citizen and as a competitor in the labor market." *Robinson v. Cahill*, 62 *N. J.* 473, 515 (1973) (other history and citations omitted). Children will be sent to the Areba School in order to meet educational obligations of local boards of education. The Areba School will provide therapy as a means of furthering that education. Institutions for emotionally disturbed children providing special educational programs approved by a state department of education have elsewhere been deemed schools within the meaning of local zoning regulations. *Wiltwyck School for Boys, Inc. v. Hill*, 11 *N. Y.* 2d 182, 227 *N. Y. S.* 2d 655, 182 *N. E.* 2d 268 (Ct. App. 1962); *Armstrong v. Zoning Bd. of Appeals for Washington Tp.*, 158 *Conn.* 158, 257 *A.* 2d 799 (S. Ct. 1969); see Annotation, "What

Constitutes 'School,' 'Educational Use,' or The Like Within Zoning Ordinance," 64 *ALR* 3d 1087, 1120 (1975).

We have no doubt that Areba is a school within the meaning of our laws and Randolph Township's zoning ordinance. The constitutional obligation to furnish a "thorough and efficient" system of education has been recently defined by the legislature to include the teaching of basic communication and computational skills, programs designed "to develop the individual talents and abilities of pupils," and programs supportive of "all pupils especially those who are educationally disadvantaged or who have special educational needs * * *." *N. J. S. A.* 18A:7A-5, quoted in *Robinson v. Cahill,* 69 *N. J.* 449, 457 (1976). This has long been the educational objective of our laws. An earlier study commission report, commonly referred to as the Bateman Commission Report, stated (at 38):

Each child in the State has the right to an educational program geared to the highest level he is capable of achieving, permitting him to realize his highest potential as a productive member of society. [quoted in *Robinson v. Cahill,* 118 *N. J. Super.* 223, 270 (Law Div. 1972)]

 In their brief defendants ask us to reverse the trial judge's finding that Areba, if deemed a school, could operate as a continuing nonconforming use under the certificate of occupancy previously granted to the military academy. In the absence of a cross-appeal this issue is not before us. *Franklin Discount Co. v. Ford,* 27 *N. J.* 473, 491 (1958); *Lyons v. Hartford Ins. Group,* 125 *N. J. Super.* 239, 248 (App. Div. 1973), certif. den. 64 *N. J.* 322 (1974). However, were we to consider the issue we would have no doubt that Areba may operate as a proper nonconforming use.[3]

---

[3]Certificates of occupancy for the military academy were issued in 1966 and 1967. Pursuant to a contract with DYFS, the military academy accepted a number of children, comprising a small per-

The determination below that the Areba School was not an educational institution within the meaning of the pre-existing zoning ordinance is reversed. Judgment is entered in favor of plaintiff, enabling it to operate the proposed school on these premises.

centage of the academy's student body, who were emotionally disturbed or came from broken homes. Areba and the military academy are both residential schools and are substantially similar uses within the zoning ordinance's classification. Thus, Areba should be allowed to occupy and use the premises as a valid continuation of the prior use which has become non-conforming by virtue of the amendment to the zoning ordinance passed in the municipality's unsympathetic and parochial attempt to zone out this needed educational institution. See *North Bergen Tp. v. Thomas S. Lee Enterprises*, 75 *N. J. Super.* 17, 21 (App. Div. 1962).