HARBOR SCHOOLS, INC. & others *vs.* BOARD OF APPEALS
OF HAVERHILL & another[1]
(and a companion case[2]).

Essex.    November 16, 1976. — August 19, 1977.

Present: KEVILLE, GOODMAN, & ARMSTRONG, JJ.

*Zoning,* Educational use.   *Education.*   *Words,* "Education."

In an appeal from a decision of a board of appeals under G. L. c. 40A, § 21, and a related action for declaratory and injunctive relief, findings in a master's report were an adequate basis for judgments to the effect that a facility for the care and education of emotionally disturbed children was exempt from the local zoning ordinance under the provisions of c. 40A, § 2, as amended through St. 1959, c. 607, § 1.  [602-608]

TWO CIVIL ACTIONS commenced in the Superior Court on June 13, 1974, and August 22, 1974, respectively.

The cases were heard by *Linscott,* J., on reports of a master.

---

[1] The other plaintiffs in this action are Donald MacDonald, the owner of the premises at 675 Main Street in the city of Haverhill (the premises), and Arthur C. DiMauro, the executive director of Harbor Schools, Inc., and a party (as buyer and as trustee) to a purchase and sale agreement of the premises. The other defendants were the building inspector of the city of Haverhill and six residents, each of whom owns property in the zoning district in which the premises are located.

[2] The companion case was brought by the six residents against Harbor Schools, Inc., DiMauro and MacDonald.

*Donald G. Tye* (*Edward J. Barshak* with him) for the Board of Appeals of Haverhill & another.
*James P. Cassidy, Jr.,* for Harbor Schools, Inc. & others.

GOODMAN, J.   These are appeals from two judgments, each in an action in the Superior Court, both of which upheld a claim made under G. L. c. 40A, § 2,[3] by Harbor Schools, Inc. (Harbor Schools), that it is entitled to operate a facility on the premises without regard to the use restrictions of the Haverhill zoning ordinance. One of the actions (see fn.1) is an appeal under G. L. c. 40A, § 21, from the decision of the board of appeals of Haverhill (board), revoking a building permit (G. L. c. 40A, § 13) to make repairs and changes in the building on the premises in contemplation of its use by Harbor Schools. The only reason given by the board for its decision was that "[t]he Board of Appeals feels that this type of facility is not exempt from the zoning ordinance under the provisions of Massachusetts General Laws, Chapter 40A, Section 2." The judgment entered in that action determined that the "[p]laintiff, Harbor Schools, Inc., conducts facilities of an educational nature which serve a public purpose and, in accordance with [G. L. c. 40A, § 2], is exempt from the operation of the zoning by-laws of the City of Haverhill and is entitled to a building permit at 475 Main Street, Haverhill." The board and one of the individual residents, Dorothy Tye, who owns property at 681 Main Street in the vicinity of the premises, appealed (see fn.1).

The second judgment was entered in a companion case for declaratory and injunctive relief (see fn.2). It raised the same issue as did the appeal from the decision of the

---

[3] General Laws c. 40A, § 2, as amended through St. 1959, c. 607, § 1, provided in pertinent part: "[N]o ordinance ... which prohibits or limits the use of land ... for any educational purpose which is ... public shall be valid."

The statutory references in this opinion (except where otherwise specifically indicated) are to the provisions of The Zoning Enabling Act as in effect prior to St. 1975, c. 808, § 3. Both parties have assumed the applicability of the old Zoning Enabling Act. See St. 1975, c. 808, § 5.

board under G. L. c. 40A, § 21, and the judgment entered was to the same effect as the judgment in that case; Dorothy Tye appealed.

Both cases had been referred to a master who had heard them together and had filed two separate reports which were confirmed and in which the findings of substantive facts are identical. (References hereafter to the master's report, in the singular, are intended to include both reports.) The only question before us is whether the master's report yields an adequate basis for the judgments. *Whaler Motor Inn, Inc.* v. *Parsons*, 3 Mass. App. Ct. 662, 666 (1975), and cases cited;[4] *S.C.* 372 Mass. 620, 621, fn.4 (1977). We hold that it does.

The master found that Harbor Schools was a corporation organized under G. L. c. 180 and that it operated three facilities, two in Maine and one in Amesbury, Massachusetts, "which are devoted to the education and improvement of emotionally disturbed children"; the premises in Haverhill are proposed as the site of a fourth such facility. Harbor Schools admits children from the ages of five to eighteen years. It is anticipated that admissions to the Haverhill facility will be confined to girls from the ages of thirteen to eighteen. The master further found that Harbor Schools had fifty-one "students" referred through agencies of the Commonwealth — primarily by the Department of Public Welfare. However, individual private admissions are possible.

The master viewed the facility in Amesbury, which the parties agreed "was typical of the other units operated by The Harbor Schools, Inc. and would, in a great measure, be similar to the facility intended to be operated in Haverhill."

---

[4] No question of standing or other procedural matter is raised. The appellants have included in the record appendix various documents designated as "exhibits," presumably received by the master. They are not referred to in the master's report and there is nothing to indicate that they are otherwise part of the record on appeal. We therefore confine our consideration to the master's report. (The board and Tye filed a joint brief and appendix; references to the board as appellant shall be deemed to include a reference to the individual appellant Tye as well.)

He found that "[t]he facility lacks some of the sophisticated and modern equipment found in some public schools, but in its simple state, it offers an atmosphere of calm, home life, coupled with educational indoctrination in each case suitable and essential for the individual involved. In the educational process the facility attempts to tune in the wave length of the particular student's intellectual capacity and to keep up with his learning ability and achievements. It constantly attempts to keep up with the student and develops his abilities. Correction for character weaknesses is also handled on an individual basis."

He further found, with reference to Harbor Schools generally, that each facility had two teachers who "are college graduates — all with Bachelors degrees, some of them have Masters degrees. Most of them, if not all, have had specialized training in dealing with children having unusual emotional problems of psychiatric nature, requiring special knowledge and experience."[5] He also found that the executive director of the facilities was a "well educated man of vast experience in special education" and was amply qualified "to administer the program of these facilities which are devoted to the education and improvement of emotionally disturbed children."

The master found that "[t]he children [whom] The Harbor Schools, Inc. works with are basically emotionally disturbed children with educational and in most instances psychological problems. . . . In every case, each of these children admitted needs emotional psychiatric adjustment as well as daily educational indoctrination in the basic studies such as English, mathematics, science, etc. Most of these children are so emotionally maladjusted that it is impossible to keep them in any public school facility and they need special attention and individual care. . . . [A]s each child is admitted, each child is given various tests to determine his intellectual capacity, any social problems which

---

[5] "[I]n addition to the teachers . . . there are house counsellors and house matrons who oversee the activities of the children who are housed in the facility and attend to their needs."

he may have, his spirit of cooperation, and his ability to become involved and socialize with his fellow students. . . . [A]ll of the children are given periodic diagnostic reading tests which consist of word recognition, word analysis, various achievement tests which involve world [word?] knowledge, reading comprehension, spelling, language, simple mathematical computation, [and] mathematical problems. [V]arious standard tests which are employed in the public school system are also used at this facility. Each is given standard achievement tests which are used and recognized for public schools."[6]

The master's findings find support in the purposes of Harbor Schools set out in its articles of incorporation which, as listed by the master, indicate an emphasis on education and instruction. Further, the master found that Harbor Schools was given a tax exemption "under Chapter 32 of the Internal Revenue Code, as a non-profit educational institution permitting it to purchase gas and lubricating oil tax free" (presumably under I.R.C. § 4221[a][5] and § 4221[d][5]).

In view of the master's report the board (see fn.4) has properly abandoned the contention apparently made to the master that (as stated in the master's report), "the use to which the building is to be put is merely a care facility for children, with underlying medical facilities and with minimal educational aspects . . . ." The board now argues that (as stated in its brief) "at the very most the education supplied to them is an equal objective with their rehabilitation." But "education" and "rehabilitation" do not denote functions so distinct that the master could be required to quantify them relative to each other. They are not mutually exclusive. Almost one hundred years ago the Supreme Judicial Court characterized "education" as "a broad and comprehensive term. It has been defined as 'the process of

---

[6] Other relevant findings are: "The Harbor Schools, Inc. facilities have a modest library containing an encyclopedia, dictionaries, elementary science books, first aid books, fictional novels and stories. There are also history periodicals and sundry reading materials that are suitable for the education of the children."

developing and training the powers and capabilities of human beings.' ... Education may be particularly directed to either the mental, moral, or physical powers and faculties, but in its broadest and best sense it relates to them all." *Mount Hermon Boys' Sch.* v. *Gill,* 145 Mass. 139, 146 (1887). *Emerson* v. *Trustees of Milton Academy,* 185 Mass. 414, 418 (1904). *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph,* 334 Mass. 530, 541 (1956).

The definition seems to us still serviceable despite the new jargon (e.g., "rehabilitation," "therapeutic") which has accompanied attempts to create new disciplines. The definition is echoed in Webster's Third New International Dictionary 723 (1971) which gives as one of the definitions of "education": — "the act or process of providing with knowledge, skill, competence, or usu[ally] desirable qualities of behavior or character or of being so provided esp[ecially] by a formal course of study, instruction, or training."

We see nothing inconsistent with educational purpose in the fact that the facility provides live-in accommodations. This is well settled. *President & Fellows of Harvard College* v. *Assessors of Cambridge,* 175 Mass. 145, 146-147 (1900). See *Trustees of Phillips Academy* v. *Andover,* 175 Mass. 118, 125 (1900); *Emerson* v. *Trustees of Milton Academy, supra; South Lancaster Academy* v. *Lancaster,* 242 Mass. 553, 556 (1922). Nor is its purpose any the less educational because it is confined to emotionally disturbed children. *Assessors of Lancaster* v. *Perkins Sch.,* 323 Mass. 418, 421-422 (1948) (upholding a finding by the Appellate Tax Board that the taxpayer, incorporated for the benefit of "retarded or badly adjusted children and of others requiring special educational or medical treatment," was entitled to a tax exemption as an educational institution). *Armstrong* v. *Zoning Bd. of Appeals,* 158 Conn. 158 (1969) (a nonprofit facility "designed for the education of children with mild emotional disturbances and ... utiliz[ing] tutoring, remedial educational and rehabilitative techniques" [at 161, n.1] "conforms with an accepted meaning of the word 'school' under 'the broad modern concept of education and within the meaning of the term as it was used in the [zon-

ing] ordinance' " [168]). *Wiltwyck Sch. for Boys, Inc.* v. *Hill*, 11 N.Y.2d 182, 190, 193 (1962) (an institution for the care and education of emotionally disturbed, delinquent, dependent or neglected boys aged 8 to 12 operated by a private nonprofit corporation is a "school" as that term is defined in a zoning ordinance "despite the fact that the students require special attention"). See generally Annot., What Constitutes "School," "Educational Use," or the Like Within Zoning Ordinance 64 A.L.R.3d 1087 (1975).

It is significant that the Legislature in c. 766 of the Acts of 1972, in connection with its policy "to provide an adequate, publicly supported education to every child resident therein," has recognized that "children ["with special needs"] have a variety of characteristics and needs, all of which must be considered if the educational potential of each child is to be realized."[7] Such a child is defined broadly as a "child who, because of temporary or more permanent adjustment difficulties or attributes arising from intellectual, sensory, emotional, or physical factors, cerebral dysfunctions, perceptual factors, or other specific learning disabilities or any combination thereof, is unable to progress effectively in a regular school program and requires special classes, instruction periods, or other special education services in order to successfully develop his individual educational potential." G. L. c. 71B, § 1, inserted by St. 1972, c. 766, § 11.

---

[7] This policy had its beginning at least as early as 1848 when the Legislature (in language more blunt than we now use) appropriated "a sum not exceeding twenty-five hundred dollars annually, for the term of three years, for the purpose of training and teaching ten idiotic children." Res. 1848, c. 65. It was passed after a report, submitted by Samuel Gridley Howe (1848 Sen. Doc. No. 51, at 52), who wrote, "Massachusetts admits the right of all her citizens to a share in the blessings of education; she provides it liberally for all her more favored children; if some be blind or deaf, she still continues to furnish them with special instruction at great cost; and will she longer neglect the poor idiot, — the most wretched of all who are born to her, — those who are usually abandoned by their fellows, — who can never, of themselves, step up upon the platform of humanity, — will she leave them to their dreadful fate, to a life of brutishness, without an effort in their behalf?" See Schwartz, Samuel Gridley Howe, Social Reformer 1801-1876, c. X, ("The Education of the Feeble Minded") (1956).

Harbor Schools, Inc. *v.* Board of Appeals of Haverhill.

While the emphasis of the statute is on integration of these children into the public school system, it contemplates, as an alternative, participation in a program of "(8) teaching or treatment at a short or long term residential school." G. L. c. 71B, § 2, inserted by St. 1972, c. 766, § 11. And indeed the master found that the Haverhill site had been given a three-month interim approval under c. 766. See G. L. c. 71B, § 10, inserted by St. 1972, c. 766, § 11. Such approval seems quite consistent with the findings of the master detailed above and his final comprehensive finding that "each facility conducts a school for intellectually inferior and emotionally disturbed children where systematic instructions are given to each child in accordance with his needs as well as assistance to correct emotional disturbances if such assistance is required to help the child to pursue and respond to a useful life."

In order to qualify for the zoning exemption under G. L. c. 40A, § 2, Harbor Schools must be found to serve "any educational purpose which is . . . public."[8] *Worcester* v. *New England Inst. & New England Sch. of Accounting, Inc.* 335 Mass. 486 (1957). Whether it serves a public purpose "is to be determined by application of the well established principles which have been applied under other statutes or legal rules to determine whether the purpose of educational or other institutions is public or private as shown in the operation of the institutions and the benefits conferred thereby." *Id.* at 493.

The articles of incorporation of Harbor Schools provide that "[t]he Corporation is irrevocably dedicated to and operated exclusively [for] non-profitable and charitable purposes, and no part of the income or assets of the Corporation shall be distributed to or enured to the benefit of any

---

[8] We make no determination whether the applicability of the zoning exemption turns on the same substantive considerations under the successor provision to § 2, G. L. c. 40A, § 3, which was inserted by St. 1975, c. 808, § 3, and reads "nor shall any such ordinance or by-law prohibit, regulate or restrict the use of land or structures . . . for educational purposes on land owned or leased by . . . a non-profit educational corporation."

individual, except such reasonable compensation as may be allowed for services actually rendered the Corporation, and assets, benefits or rights granted to the Corporation." Decisive on this question is the master's finding that, "[o]n all of the evidence, and all of the reasonable inferences which I can draw therefrom . . . I find that the operations of . . . Harbor Schools, Incorporated are of a public nature. I find that its undertakings and objectives as such are not commercial in character and not motivated for personal profit of any group, and generally serve a public purpose." There is nothing in the master's report inconsistent with this decisive general finding. And the appendix brings us nothing in the way of a motion to recommit, or other motion which attacks this general finding. See *Bills* v. *Nunno,* 4 Mass. App. Ct. 279, 281-282 (1976).

*Judgments affirmed.*