526 A.2d 81

CARROLL COUNTY, Maryland

v.

RAYMOND I. RICHARDSON FOUNDATION, INC.

No. 1183, Sept. Term, 1986.

Court of Special Appeals of Maryland.

June 5, 1987.

Paul G. Zimmermann, Sr. Asst. Co. Atty. for Carroll County (Charles W. Thompson, Jr., Co. Atty. for Carroll County, on the brief), Westminster, for appellant.

Charles M. Preston (Stoner, Preston & Boswell, Chartered, on the brief) Westminster, for appellee.

Argued before ALPERT, BLOOM and KARWACKI, JJ.

KARWACKI, Judge.

The issue presented by this appeal is whether the Bowling Brook Home for Boys (the Home) in Middleburg, Maryland is a "school" so that it may be operated on land zoned agricultural by the Carroll County Zoning Ordinance (1965, as amended through 1985). Article 6, § 6.2(i) of that ordi-

nance lists as one of the principal permitted uses under the agricultural classification, "Schools and colleges, including nursery schools or day care centers." The Circuit Court for Carroll County (Gilmore, J.) ruled that the Home met that definition, reversing a contrary decision by the County Board of Zoning Appeals. We agree with the Circuit Court and affirm its judgment.

The Raymond I. Richardson Foundation, Inc., a nonprofit charitable organization, operates the Bowling Brook Home for Boys. The Home was established in 1957 on a portion of a 263 acre horse farm owned by the Foundation.

The Home's current facilities consist of a manor house, an administrative office building, staff living quarters, a maintenance barn, a sports clubhouse, a baseball field and a basketball court. The Foundation's plans to abandon those facilities and to construct a new expanded physical plant for the Home at another site on the 263 acre tract precipitated this zoning dispute.

Michael Sunday, director of the Home, testified before the Board of Appeals: "Bowling Brook Home for Boys is a residential facility that provides educational, counseling, vocational training to young men with troubled backgrounds, ages 15½ to 18, who have been deemed by the courts to be removed from their home so that we can provide care, assistance and guidance to these young men." The program at the Home is licensed by the State Juvenile Services Administration and is a highly structured one. Mr. Sunday described the daily regimen:

[T]hey get up at six o'clock in the morning, make their beds, take their showers, prepare themselves for breakfast. A number of the boys also prepare breakfast. After breakfast, the boys go out to a work program from 8 to 12, supervised by one of our staff members. Upon return, at twelve o'clock we have lunch and following lunch, we have on-grounds educational program from one o'clock to four o'clock, which is staffed by a certified teacher from the State of Maryland. From 4:15 to 5:45, an hour and a half, we have a group meeting every day,

which is used to identify problems, to resolve problems and to have all the young men in the group involved in the helping process with each other. Following the group meeting at 5:45 we move into supper at six o'clock and following supper and the chores around supper, from 7 to 8:30 or 7 to 9, we have a supervised recreational period for these young men. Following the recreational period, we have another group meeting, which we term a riff-raff, which is more than say a counseling session. It's more of a planning session for the following day and that's from 9 to 10. Following that, there is a short free period for snacks and maybe listening to some music or a game of pool and then they're in bed by eleven o'clock
. . . .

The average length of stay of residents in the program is five and a half to six months.[1] Mr. Sunday pointed out that most of the boys in the Home are boys referred by the Juvenile Services Administration who have been adjudicated delinquent, in need of assistance or in need of supervision by the juvenile courts of this State pursuant to Md. Code (1984 Repl.Vol.), §§ 3–801 through 3–835 of the Courts and Judicial Proceedings Article. That administration has classified the Home as a "juvenile care facility—group home."[2]

---

**1.** The Home also formerly operated a "graduate program" for boys who had successfully completed the initial program. The "graduate program," which was located on a different portion of the property, has been discontinued and is not a subject of this appeal.

**2.** "Juvenile care facilities" are defined in COMAR 10.25.03.01, adopted by the Department of Health and Mental Hygiene for its Juvenile Services Administration pursuant to Md.Code (1982), § 6–125(b) of the Health-General Article. It provides:

A. "Juvenile care facility" is a generic term which denotes the administration, program, and physical plan involved in rendering residential services on a 24–hour basis to youths under 21 years old.

B. The following types are included in the definition of "Juvenile care facilities."

. . . . .

(4) "Youth group home" means a community based family-type dwelling, housing between five and twelve youths operated separately or as a part of an affiliate corporation. The purpose of the home

Mr. Sunday elaborated on the educational component of the Home's program:

The educational component, though we only have one certified teacher in the classroom, our group leader who handles the group sessions, is a certified educator. Our vocational supervisor is a Master degree person with an education degree and I feel like not just the classroom but the total program is an educational process. With some young men, for example, that would come into our educational program, we coordinate with the school that they may be targeted to return to, that school will send us materials which [we] will monitor.... [L]ast spring, we had a young man graduate from his high school while he was still in our program, or upon the day after he was released from our program. I think more than anything else, sir, most of our boys have been failures in school and another focus of our educational program is to whet their appetite for learning and to have them understand that in order for them to be successful out there, they are going to have to learn every day of their lives and if not, they are going to struggle.

. . . . .

[W]hat we do is we have to by State law develop an I.E.P.,[3] which is an individual education plan for each

---

is to offer a group living experience in a neighborhood not unlike the original community from which the youth originates and to which he is expected to return.

3. COMAR 10.25.03.18 requires that a juvenile care facility provide at least the following educational program components:
    D.  Education and Employment Services.
       (1) Each facility shall provide for an educational or employment program designed to meet the needs of each youth.
       (2) Education.
          (a) As appropriate for individual youths, arrangements shall be made for their enrollment in a school approved by the Department of Education. Educational records shall be maintained in accordance with Regulation .15C(9).
          (b) When enrollment of a youth in a school is inappropriate, the facility shall provide an educational program designed to meet the needs of each youth until he can be enrolled in a school.

unit, which needs to be reviewed by the case worker, the parents, youth and the people involved with our facility. Also we have an educational coordinator, who is not a paid staff member out of Bowling Brook, but is a member of the Carroll County Board of Education of the public school system, Mr. Larry Weis from the Bowling Brook Service Center. He also oversees and coordinates our educational programs.

.     .     .     .     .

I feel as far as meeting the State regulations and the certifiable monitoring that the student—insures that we adhere to—that we are meeting the time frame for the educational services that we are providing.

Mr. Sunday also stressed that "[m]ost of the young men that come to our facility are functioning usually below their grade level in math and reading, and we do a lot of remedial work to try to bring them up to level...." Although only one teacher monitors the daily three hour education session, four members of the Home's staff are certified teachers who interact with the boys. A vocational program is also a part of the curriculum.

---

(c) The program shall:
    (i) Be staffed with qualified teachers, as specified in Regulation .14H.
    (ii) Be regularly scheduled.
    (iii) Include instruction in the studies usually taught in the public schools to youths of the same age.
    (iv) Be short term, not more than 90 days, with an immediate objective of returning the youth to school. The juvenile care facility may not provide long-term educational programs.
    (v) Be coordinated with local educational agency to assure proper placement when the youth returns to school.
    (3) The juvenile care facility shall maintain educational records which include:
    (a) Each youth's weekly schedule including subjects, teachers, and time schedules for each subject; and
    (b) Grade and progress reports.
    (4) Employment Service. If enrollment in a school program is inappropriate, the youth shall be enrolled in a vocational training program, a special employment preparation program, or helped to find employment.

In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention. *Reid v. State,* 302 Md. 811, 816, 490 A.2d 1289 (1985); *Atlantic Richfield Co. v. Sybert,* 295 Md. 347, 361, 456 A.2d 20 (1983); *Smelser v. Criterion Ins. Co.,* 293 Md. 384, 388–89, 444 A.2d 1024 (1982); *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091 (1979). The primary source of legislative intent is, of course, the language of the statute itself. *Auto. Trade Ass'n. v. Harold Folk Enter.,* 301 Md. 642, 653, 484 A.2d 612 (1984); *Haskell v. Carey,* 294 Md. 550, 556, 451 A.2d 658 (1982); *Bledsoe v. Bledsoe,* 294 Md. 183, 189, 448 A.2d 353 (1982); *State v. Berry,* 287 Md. 491, 495, 413 A.2d 557 (1980). When the legislature has not defined a term, it should ordinarily be given its usual and natural meaning. *DeJarnette v. Federal Kemper Ins. Co.,* 299 Md. 708, 717, 475 A.2d 454 (1984); *Brown v. State,* 285 Md. 469, 474, 403 A.2d 788 (1979); *Mauzy v. Hornbeck, supra,* 285 Md. at 84, 400 A.2d 1091; *Williams v. Loyola College,* 257 Md. 316, 328, 263 A.2d 5 (1970). Of course, where statutory provisions are clear and unambiguous, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation. *State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985); *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 619, 458 A.2d 758 (1983).

*Tucker v. Firemen's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986). We apply this precept to the use of the term "schools" by the County Commissioners of Carroll County when they legislated that "Schools and colleges, including nursery schools or day care centers" are a principal permitted use on land classified agricultural under the county's zoning ordinance. *Clarke v. County Comm'rs for Carroll County,* 270 Md. 343, 349, 311 A.2d 417 (1973). Since the ordinance does not contain a definition of "school," the word should be given its usual meaning.

"School" is defined in Webster's New World Dictionary 1274 (1984) as "a place or institution for teaching and learning; [an] establishment for education...." Black's Law Dictionary 1206 (5th ed. 1979) similarly defines "school" as "[a]n institution or place for instruction or education." We also think the concluding phrase of § 6.2 of the ordinance, "including nursery schools or day care centers," is significant. The Court of Appeals observed in *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 111, 453 A.2d 1198 (1983), that "[o]rdinarily the word 'including' means comprising by illustration and not by way of limitation." Therefore, other non-traditional types of schools are not excluded merely because they were not specifically provided for in the ordinance. In some jurisdictions, day care centers and nursery schools are not considered schools for zoning purposes. See cases collected in Annot., 64 A.L.R.3d 1087, 1104–10 (1975).

Maryland's appellate courts have considered the definition of the word "school" in several different contexts. In *Wooddy v. Wooddy*, 258 Md. 224, 265 A.2d 467 (1970), and in *McClure v. McClure*, 15 Md.App. 226, 289 A.2d 610 (1972), the term was used in separation agreements. In *Wooddy*, the parties' son Eddie Lee suffered from Down's syndrome and was enrolled at a training school for such children. The Court of Appeals considered this type of training school a "special school" within the scope of the separation agreement's provision for "special schooling." The cost of the boy attending a recreational camp, however, was not considered tuition for "special schooling" within the meaning of that term as used in the separation agreement. *Wooddy v. Wooddy, supra*, 258 Md. at 229–30, 265 A.2d 467. In *McClure*, "schooling" was not adequately defined by the parties in their separation agreement. This Court held that expenses for room and board at a boarding school were not encompassed within the provision requiring the husband to pay the cost of the children's "schooling." 15 Md.App. at 231–32, 289 A.2d 610. Rather, we concluded that these expenses were part of the support and mainte-

nance obligation imposed on the husband by the court and were to be deducted from the child support payments that he made to his ex-wife. Finally, we held that tuition for boarding school was an expense within the scope of the provision made in the agreement for "schooling." *Id.* at 233, 289 A.2d 610.

The Court of Appeals discussed the nature of a school at length in *Board of Public Welfare v. Myers,* 224 Md. 246, 167 A.2d 765 (1961). The question presented to the Court in *Myers* was whether the racial segregation of juvenile offenders in State training schools violated the dictates of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In concluding that such practice was unconstitutional, the Court relied on the fact that

> the record makes it clear that educational programs offered in the training schools are substantially the same as those offered in the regular public schools. The trial judge in the instant case found as a fact, from the evidence submitted, that these programs are so closely patterned after those in the public schools that a child, when his scholastic grades and credits are earned, "can usually return to his former school in his neighborhood ... without academic difficulty." The judge stated that the training schools are "basically schools, and not custody-centered institutions with education secondary." In support of his conclusion that they are "a part of the State's public education system," he pointed out that there are some public schools in Maryland that admit only special groups of problem or handicapped children. He also referred to the fact that by Chapter 29 of the Acts of 1922, the Maryland Training School was placed under the general supervision of the Department of Education, and its transfer to the Department of Welfare in 1943 did not alter its basic character.

*Myers, supra,* 224 Md. at 254–55, 167 A.2d 765.

Several cases from other jurisdictions are persuasive authority on the question presented to us. In *Crist v. Bishop,* 520 P.2d 196 (Utah 1974), the Supreme Court of Utah held

that a juvenile training facility was a " 'school' within the meaning of that term as used in the zoning ordinance of Utah County." *Id.* at 199. The Court, rejecting the defendant's argument that the institution was more of a correctional facility than a school, stated:

> The requisites of . . . a school are: some physical facility, teachers, a curriculum for study or training, and students who are the object thereof. If these requisites are met, the status of the institution is not changed because of variation in methods of teaching or of training, or of discipline or control. These are all present in greater or lesser degree in practically all schools; and they may vary greatly without preventing one from being properly so characterized. *Id.* at 198–99 (footnote omitted).

At issue in *Armstrong v. Zoning Board of Appeals,* 158 Conn. 158, 257 A.2d 799 (Conn.1969), was a proposed school for children who were "maladjusted" but not "psychotic, insane, mentally retarded or delinquent . . . ." *Id.* at 802 n. 2. The school, located upon an estate known as "Glenholme," was to provide "tutoring" for the children. Based on the record of the various proceedings below, which included evidence that the curriculum offered at Glenholme would be comparable to that afforded in the public schools, that the facility "would operate as a school approved by the department of education," and that the staff would include "one principal-teacher-administrator, four teachers, one remedial tutor and two recreation teachers," *id.* at 802, the Supreme Court of Connecticut concluded that the proposed use conformed with the generally accepted meaning of the word "school" as used in the local zoning regulations. *Id.* at 804. The Court of Appeals of New York, in *Wiltwyck School for Boys, Inc. v. Hill,* 11 N.Y.2d 182, 227 N.Y.S.2d 655, 182 N.E.2d 268 (N.Y.1962), described the boys accepted to the Wiltwyck School by stating: "All the boys 'are referred because there is some mal-adjustment in their getting along in society', and many need psychiatric care." *Id.* 227 N.Y.S.2d at 659, 182 N.E.2d at 271. Generally, half of the children admitted were delinquents referred by the

juvenile court, and the other half were neglected children. The school admitted boys aged eight to 12, and a regular elementary school curriculum was taught at Wiltwyck. Counseling and typical boarding school activities complemented the formal education provided. *Id.* 227 N.Y.S.2d at 660, 182 N.E.2d at 272. These factors were considered sufficient by the Court to support the conclusion that the "Wiltwyck School for Boys is a school within the language of the Yorktown Zoning Ordinance." *Id.* 227 N.Y.S.2d at 662, 182 N.E.2d at 274.[4]

In the case *sub judice,* the Home is staffed with four qualified teachers. One teacher supervises the daily three hour classroom session. Each boy, differing in age and ability, has a personalized program tailored to his needs. Each boy's program is coordinated with the public school system to which the boy will return. The Home complements the educational aspect of its program with vocational training, group counseling sessions, and recreational activities. These programs are similar to those offered in the State institutions found by the Court of Appeals in *Board of Public Welfare v. Myers, supra,* to be part of the public educational system. In that case the Court of Appeals did not agree with the State's position that "training schools for delinquent minors are places of detention, analogous to prisons, although the accent is on education and training rather than punishment." 224 Md. at 253, 167 N.E.2d 765. *See also Armstrong v. Zoning Board of Appeals, supra,*

---

**4.** For cases holding that schools for the mentally retarded, emotionally disturbed or physically handicapped are "schools," or educational in nature, thus qualifying for treatment as such under zoning ordinances, see *Fitchburg Housing Authority v. Board of Zoning Appeals,* 380 Mass. 869, 406 N.E.2d 1006 (1980); *Harbor Schools, Inc. v. Board of Appeals,* 5 Mass.App. 600, 366 N.E.2d 764 (1977); *Areba School Corp. v. Mayor & Council of Randolph,* 151 N.J.Super. 336, 376 A.2d 1273, *cert. denied,* 75 N.J. 586, 384 A.2d 816 (1977); *Rogers v. Association for the Help of Retarded Children,* 308 N.Y. 126, 123 N.E.2d 806 (1954); *In re Gilden's Appeal,* 406 Pa. 484, 178 A.2d 562 (1962); *Walker v. Zoning Bd. of Adjustment,* 380 Pa. 228, 110 A.2d 414 (1955); *School Lane Hills, Inc. v. East Hempfield Township Zoning Hearing Bd.,* 18 Pa.Cmwlth. 519, 336 A.2d 901 (1975).

and *Wiltwyck School for Boys, Inc. v. Hill, supra. Cf. Pennsylvania George Junior Republic v. Zoning Hearing Bd.*, 37 Pa.Cmwlth. 151, 389 A.2d 261 (1978) (group home not a school since boys were sent to public school rather than provided with on-site educational program). Given the attributes of the Home, and the indisputable focus of the program on education, the Home is a school, and is a principal permitted use in an agricultural district under the Carroll County Zoning Ordinance.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.