702 A.2d 928

**Kevin Joseph WIEGMANN**

v.

**STATE of Maryland.**

**No. 1432, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Dec. 1, 1997.

318

320

Claudia A. Cortese, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore (Marna McLendon, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before MURPHY, C.J., HOLLANDER, J., and JOHN J. BISHOP, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

This criminal case arises from a courtroom brawl that erupted during domestic proceedings before a circuit court master. We must determine whether the authority of a domestic master to conduct and regulate court proceedings includes the power to authorize the arrest of a litigant, pending judicial review of the master's recommendation of a finding of contempt and immediate incarceration.

Kevin Joseph Wiegmann, appellant, appeared without counsel before a circuit court master for a contempt hearing in connection with his failure to pay court-ordered child support. At the conclusion of the hearing, the master opined that appellant was in contempt and that immediate incarceration was warranted. Consequently, two sheriff's deputies who were stationed in the courtroom attempted to handcuff appellant. A scuffle ensued that culminated in criminal charges against appellant for resisting arrest and assault and battery. Thereafter, a jury in the Circuit Court for Howard County acquitted appellant of resisting arrest, but convicted him of battery. The court sentenced appellant to ninety days of incarceration, with all but ten days suspended, followed by fifteen months of probation.

Appellant timely lodged his appeal and presents three questions for our review, which we have reordered:

I. Did the trial court erroneously restrict defense counsel's ability to present a defense?

II. Did the trial court err in its instructions to the jury?

III. Was the evidence sufficient to support appellant's conviction?

We answer the first two question in the affirmative. Accordingly, for the reasons that follow, we shall vacate appellant's battery conviction and remand for further proceedings.

### Factual Summary

The events that spawned the criminal charges occurred on September 21, 1995, when appellant appeared at a hearing before Howard County Circuit Court Master Elaine Patrick (the "master's hearing") with respect to his child support obligation.[1] A redacted version of the transcript from the master's hearing was admitted as an exhibit at the criminal trial.[2] It indicates the following, in pertinent part:

[MASTER PATRICK]: Based on the evidence I've heard today, *it is quite clear to me that the defendant is in contempt.*

\* \* \* \*

*So I am going to hold you in contempt. I'm going to sentence you to forty-five (45) days' incarceration.* I'm going to set a purge figure of Thirty–Five Hundred Dollars ($3,500.00), Mr. Wiegmann. That means, *if you pay the thirty-five hundred dollars, you do not have to serve the*

---

1. If "a picture is worth a thousand words," we are fortunate here to have the thousand words. As the underlying events occurred at the master's hearing, they were captured by the official court reporter and memorialized in the transcript of the proceedings. Thus, we are not presented with any significant factual disputes or conflicting versions of events. To the contrary, we know precisely what the master and appellant said and when they said it.

2. The State and the defense agreed that the master's hearing transcript was relevant, and a redacted version of the transcript was admitted as a defense exhibit. During questioning of a State's witness by defense counsel, the witness read portions of the transcript into the record. We note that there are insignificant variances between the version of the transcript that was read into the record and the transcript itself. To the extent there is any variation, we shall refer to the text as it appears in the transcript.

*time.* That's the difference between civil and criminal contempt.

*In light of your claim to live in Georgia, I am going to recommend that the incarceration be immediate from the courtroom, and that an immediate Order be entered.* I'm going to enter a judgment for the arrears, which is Fourteen Thousand, Nine Hundred and Ninety–Three Dollars and Sixty–Five Cents ($14,993.65). Payments through the Department of Social Services, secured by a wage lien. Future service by first-class mail.

Mr. Wiegmann: Your Honor?

The Master: Yes, Mr. Wiegmann?

Mr. Wiegmann: *Ah, I want to, like to file my exceptions now.*

The Master: Mr. Wiegmann, you can file those prior to your exceptions. *I'm going to recommend that an immediate order be entered, so we can—*

Mr. Wiegmann: *Also, a motion for stay of sentence pending the outcome of the exceptions hearing.* And a request for filing fees and costs be paid by the State for my transcripts and other related fees, since I was not—, Public Defender's—. *(To the Deputy )* *Hold on a second. Hold on a second. Get, get away from me until I'm done.*

The Master: Excuse me, Mr. Wiegmann. *This is not up to you at this point.*

The Deputy: *Put your hands behind your back.*

The Master: *Cooperate with the deputies, Mr. Wiegmann.*

(Emphasis added).

The State also called Master Patrick as a witness. She explained that after she announced her findings, appellant approached the bench to file handwritten exceptions and a motion to stay the sentence.[3] The master planned "to pass them along to the Judge" so that the court could consider the

---

3. The parties stipulated that appellant did file his exceptions and his motion to stay at the master's hearing.

pleadings in its evaluation of her recommendation. As appellant was speaking to the Master Patrick, she observed that

> the deputies were standing, and [appellant] said—he was saying stop, or back up or something. I didn't understand that because they were just—in my recollection they were just standing there. And then I had his paper, the deputy stepped forward, and then he started saying get away from me, get away from me. I said Mr. Wiegmann, it's not up to you at this point.

When the master saw appellant's "arm going up," she left the courtroom to find another deputy, out of concern that there might be an "incident."

Master Patrick explained that she recommended immediate incarceration because she did not want appellant, who resided in Georgia, to avoid a jail sentence by flight. Her "concern" about flight was fueled by her belief that appellant had "failed to appear for a prior hearing," he was in her court on a "cash only bond," and appellant might not "hang around" if she gave him a surrender date.

Nevertheless, the master recognized that she had no express authority to detain appellant. Indeed, she knew that only a circuit court judge could have incarcerated Wiegmann. The master believed, however, that Maryland Rules 2–541 and S74A [4] did not require her to give appellant "an opportunity to make it out the door if what I'm recommending is an immediate incarceration." Thus, she steadfastly maintained that she was entitled to detain appellant, pending the circuit court's consideration of her recommendation, because a contempt order may be entered at any time and because "the proceeding isn't actually complete until the Judge has an opportunity to rule" on the recommendation for immediate incarceration.

---

4. Effective January 1, 1997, Rule S74A was redesignated, without substantive change, as Rule 9–207. Maryland Rule 9–207(f)(3) provides: "On the recommendation by the master that an individual be found in contempt, the court may hold a hearing and direct the entry of an order at any time."

Consequently, she thought that "in that moment between making the recommendation for immediate incarceration . . . and getting the file down to the Judge and making sure that the hearing proceeds on the recommendation . . . in appropriate instances someone may need to be detained in order to insure the . . . orderly action on the recommendation."

The master acknowledged, however, that appellant never made any statements about fleeing. She also conceded that appellant appeared for the hearing even though, based on his own experience, "he understood that one potential outcome of a contempt finding could be incarceration."[5] Nor did the master ever ask appellant to "have a seat" and wait while she referred the matter to a judge. Moreover, in the particular segment of time that is especially relevant here—when appellant was at the bench filing exceptions—there is absolutely no indication in the record of any attempt by appellant to flee the courtroom.

During direct examination, the prosecutor asked the master what she meant when she said it "is not up to you at this point." The master responded:

> I meant that I was going—I wanted the deputies to detain [appellant] because I was going to . . . try to get a hearing arranged that day on my recommendation for immediate incarceration, and I was going to have him detained while that process was going forward so we could get it resolved that day. . . . That's what I meant by that, that I wanted the deputies to detain [appellant] pending disposition on my recommendation for immediate incarceration.

Master Patrick never specifically instructed the deputies to detain appellant, but she admitted that she intended "to communicate to . . . [the deputies] to please escort [appellant] out the back door and hold him until [she] had an opportunity

---

5. The master was referring to a prior sentence of 45 days that appellant had received, which was later found illegal.

to make arrangements with the Judge to hear the remainder of the proceeding."[6] The master agreed that, when the deputies sought to detain appellant, they were doing just what she wanted them to do, so that she could arrange for a judge to review her recommendations.

Although the master had not anticipated that the deputies would seek to handcuff appellant, she acknowledged that she expected appellant to comply. Moreover, the master conceded that appellant was not free to leave of his own accord. To the contrary, the master agreed that appellant's "freedom[ ] was taken from him by State authority." Master Patrick explained that, when she recommends immediate incarceration, "[t]hose gets [sic] done the same day [by the judge] one way or the other."

Two sheriff's deputies, Corporal James Horan and Deputy Andre Lingham, were assigned to Master Patrick's courtroom on the day of the incident. Corporal Horan, who testified for the State, recounted that the events in the courtroom unfolded rapidly and simultaneously.

Notwithstanding his fourteen years in the Sheriff's office, Horan testified that he did not know the legal distinction between a master and a judge, the extent of a master's authority, or the difference between a master's recommendation and a judge's order. As a deputy sheriff, Horan stated that he is "the law enforcement arm of the court," and his duties include courtroom security. He explained that "when a Judge or a Master advises that somebody is going to be taken into immediate custody from the courtroom that is directing that the subject is going to be taken into custody, to our lockup and then to the Detention Center." Moreover, in his "mind," the master had ordered appellant taken into custody, and the master is "the ruler of the court...." He said: "She

---

6. Contrary to the suggestion in the dissent, the master never declared a "recess" in order to pursue immediate judicial action in connection with her recommendation for contempt and incarceration.

wears the black robes.... And I was directed to do something and I did it...."

Horan thought, based on the master's initial remarks, that the deputies were supposed to take appellant into custody. When he heard Master Patrick say "immediate incarceration," he walked to the right side of appellant and Deputy Lingham stood by appellant's left side. Lingham took out his handcuffs, but the deputies "paused" as appellant discussed the matter with the master at the bench. Appellant then told the deputies to "[h]old on a second" and "get away from me until I'm done." When the master said "it's not up to you at this point," Horan and Lingham "attempted to take [appellant] in custody." As Lingham tried to handcuff appellant, Wiegmann "jerked and pulled away" and "clench[ed] his fist." Because appellant raised his fist, Horan believed appellant was going to strike Lingham, and he grabbed appellant's arm to prevent him from hitting Lingham. Appellant then struck Horan in the jaw and snapped Horan's head back. Horan thought appellant was attempting to run out of the courtroom.

During the altercation that ensued, the deputies grabbed appellant and all three men fell to the floor "in a big pile." Fearing that appellant might take Lingham's weapon, Horan yelled to the master to "hit the alarm." Horan then grabbed appellant around the neck, jaw, and face, and sprayed him with pepper mace. When other deputies arrived in the courtroom, appellant was handcuffed. As a result of the melee, Horan suffered shoulder and back injuries, for which he was placed on disability for one month and then light duty for several more months.

Malcolm Jacobson, an Assistant State's Attorney assigned to the Child Support Enforcement Division of the State's Attorney's office, appeared as counsel at the contempt proceeding. He testified that he heard Master Patrick find appellant in contempt and "would recommend immediate incarceration." According to Jacobson, when appellant handed various motions to the master, the two deputies approached appellant; while appellant was talking, one of the deputies

"said something about lowering his hands or putting his hands behind him." Jacobson related that Master Patrick then

said something to the [e]ffect that this was not the right time, referring to the Motions, and the deputies continued to approach Mr. Weigmann. And Mr. Wiegmann said, wait a minute, wait a minute. The deputies were there, and Mr. Wiegmann started to scream, no, no, no, no, no, and started punching at the deputies and a scuffle ensued from there.

Jacobson did not recall that the deputies tried to hit appellant, although "they were trying to restrain him. [Appellant] was doing all the hitting," and was "struggling violently."

At the end of the State's case, the court denied appellant's motion for judgment of acquittal. Laura Rosenthal, appellant's girlfriend, then testified for the defense. She recounted the following:

The Master recommended that Mr. Wiegmann be incarcerated after the hearing, and Mr. Wiegmann proceeded to file exceptions and things that you would file if you were going to be incarcerated. After that—well, he wasn't even finished. He was in the middle of handing these to the Master and the Sheriff came up behind him and went to grab him. He put his hand back, like this, and he said, I'm not done yet. And then the same Sheriff grabbed him by his arm, shoved it up behind his back and started shoving him toward the other Sheriff who grabbed him by the neck. After that I don't exactly—everything happened so fast, I don't know what happened. I mean, the next thing I knew four guys were on top of him.

Appellant, a construction superintendent for a builder of single family homes, testified in his own behalf. He stated that the deputies started to "manhandle" him while he was attempting to file his exceptions and, in a matter of seconds, "the thing got out of hand." Appellant explained:

[T]he Sheriff had come up behind me and started messing with my left hand as I was trying to hand the documents to the Master at that time. And—

\* \* \* \*

[The deputy] was trying to place it behind my back and put what we would call in the military as an arm jack, trying to jack your arm to make you submit to what he was doing.

\* \* \* \*

I motioned to him to wait until I was done and then I would go with him, and I started to try to file the things again, and the ... Deputy ... started pushing me in the direction of the other Deputy who immediately came up and grabbed me around the neck area.

Wiegmann further stated that he pushed away one deputy who had grabbed him around the neck in a choke hold because he could not breathe. He was trying to push the deputy away "at the time that [the deputy] was struck." According to appellant, no one ever told him he was under arrest or ordered him to submit to an arrest. Appellant also thought that, as an experienced litigant, his filing of exceptions would result in an automatic stay of any sentence.

In rebuttal, over defense objection, Corporal Horan testified that he decided to handcuff Wiegmann in the courtroom rather than wait until he had exited the courtroom, because he had been told of an incident in August 1995 when appellant was in court and fled out of the custody of the Sheriff's Department. Horan admitted, however, that he had no personal knowledge about the incident.

We shall include additional facts in our discussion of the issues.

## Discussion

### I.

As we noted, appellant was charged with resisting arrest and battery. Appellant's defense rested on his claim that he was illegally arrested and, therefore, he was entitled to resist with reasonable force. In so doing, he denies that he committed a battery.

It is beyond cavil that "the right to resist an unlawful, warrantless arrest remains the law of Maryland." *In re Albert S.,* 106 Md.App. 376, 397, 664 A.2d 476 (1995). Moreover, "an essential element of [the crime of] resisting arrest is that the arrest be lawful." *Monk v. State,* 94 Md.App. 738, 742, 619 A.2d 166 (1993). Thus, when confronted with an unlawful, warrantless arrest, one may lawfully resist by resorting to reasonable force. *Dennis v. State,* 342 Md. 196, 212, 674 A.2d 928 (1996), *aff'd after remand,* 345 Md. 649, 693 A.2d 1150 (1997); *Barnhard v. State,* 325 Md. 602, 614, 602 A.2d 701 (1992); *Rodgers v. State,* 280 Md. 406, 410, 373 A.2d 944, *cert. denied,* 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); *Monk,* 94 Md.App. at 745, 619 A.2d 166. The right to resist by the use of reasonable force is sometimes referred to as a "privilege." *In re Albert S.,* 106 Md.App. at 396–97, 664 A.2d 476.

Even when threatened with an illegal, warrantless arrest, however, one may not resist with excessive or unreasonable force. *See Rodgers,* 280 Md. at 421, 373 A.2d 944; *Jenkins v. State,* 232 Md. 529, 534, 194 A.2d 618 (1963). The use of excessive force may constitute a battery. *See Jenkins,* 232 Md. at 534, 194 A.2d 618. In addition, one has no right to use force to resist an unlawful arrest effectuated pursuant to a facially valid warrant. *Rodgers,* 280 Md. at 419, 373 A.2d 944. In that circumstance, the arrestee must submit and challenge the legality of the arrest in a subsequent judicial proceeding. *Id.*

As appellant's defense is grounded on the claim of an unlawful arrest, we pause to consider first whether he was actually arrested. We have little trouble in concluding that he was.

It is undisputed that the deputies sought to handcuff appellant, and this act amounted to an attempt to arrest him. An arrest is defined as "the taking, seizing or detaining of the person of another, *inter alia,* by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest."

*Morton v. State,* 284 Md. 526, 530, 397 A.2d 1385 (1979). The Court of Appeals has explained: "We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. An arrest is effected (1) when the arrestee is physically restrained or (2) when the arrestee is told of the arrest and submits." *Little v. State,* 300 Md. 485, 509–10, 479 A.2d 903 (1984) (citations omitted); *see also Barnhard,* 325 Md. at 611, 602 A.2d 701. In addition, a person is seized within the meaning of the Fourth Amendment when, " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Timms v. State,* 83 Md.App. 12, 17, 573 A.2d 397 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)) (citations and internal quotations omitted), *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990); *see also In re Joshua David C.,* 116 Md.App. 580, 593, 698 A.2d 1155 (1997).

In reaching our conclusion that appellant was arrested, we consider it significant that the State candidly conceded at oral argument that the deputies sought to arrest appellant.[7] Similarly, at trial, the prosecutor told the judge that "it was by [the master's] Order that he was detained.... She's the one who ordered him detained." The prosecutor also told the trial judge that it was clear that the law enforcement officers were trying to arrest appellant, but asserted that it was not necessary for them to advise appellant of that fact. Further, the master acknowledged that appellant was deprived of his liberty. In addition, the trial court essentially found that appellant was arrested, but she determined that it was under circumstances analogous to an arrest pursuant to a warrant. That the deputies attempted to arrest appellant is also evidenced by

---

7. In its brief, the State neither concedes nor disputes appellant's contention that he was arrested. Instead, it argues, that the master had implied authority to detain Wiegmann briefly and to arrest him. The State also asserts that, even if the master lacked such power, "Wiegmann's arrest was analogous to an arrest pursuant to a warrant," thereby precluding appellant's right to resist.

the State's subsequent decision to charge appellant with resisting arrest.

In concluding that appellant was, indeed, arrested, we do not attach significance to the absence of a formal arrest order from the master. In this regard, we observe the State does not seek to uphold the verdict because of the lack of an order from the master directing the deputies to arrest appellant. As we noted, it concedes that the master's conduct was tantamount to an arrest. It also acknowledges that the master's remarks were construed by the deputies as an order to arrest. Additionally, there is no question, based on the master's testimony, that she *intended* to detain appellant, with handcuffs if need be, and would actually have so ordered, had it been necessary. It was, however, unnecessary, because the deputies immediately understood the master's remarks as an instruction to take appellant into custody.[8] Thereafter, the master condoned the deputies' actions. She told appellant to cooperate with the deputies as they sought to handcuff him and said that it was "not up to [him] at this point." At the very least, it is clear that the deputies were doing exactly what the master intended, and the master sanctioned the deputies' conduct.

We turn to consider the legality of the arrest.

## II.

Appellant contends that his arrest was unlawful because the master lacked either express or implied authority to arrest him. He also contends that the arrest was not accomplished pursuant to a warrant, and thus he disputes the trial court's finding that the arrest was analogous to an arrest pursuant to

---

8. Even with our after-the-fact opportunity to reflect on the master's exact·words at the contempt hearing, it was, at best, unclear whether the master actually (albeit improperly) imposed a sentence, thereby prompting the deputies' actions, or merely recommended imposition of one. Initially, the master said, "I am going to hold you in contempt. I'm going to sentence you to forty-five (45) days' incarceration." Later, she said, "I am going to *recommend* that the incarceration be immediate from the courtroom." (Emphasis added).

a warrant, thereby defeating his right to resist. In addition, he claims that he did not commit a crime in the presence of the deputies, so as to entitle them to arrest him. Appellant also argued below that he never refused to submit to an arrest, because "an arrest was never communicated to him. All that was communicated to him was force."

For its part, the State contends that the master had the right to detain appellant "to insure that her recommendation of immediate incarceration could be implemented," and that the Maryland rules "implicitly give a master such authority." In particular, it points to the master's right to conduct and regulate proceedings in court and argues that this provision inherently includes the power "*to briefly* detain a defendant for the short time it takes for the court to issue an order in accordance with the master's recommendation."[9] (Emphasis added). The State also posits that, even if the arrest were illegal, the situation here was analogous to the execution of a facially valid but defective warrant; just as in the case of a defective warrant, the deputies were "merely following the order of a judicial authority." Therefore, the State suggests that appellant was not entitled to resist, just as one cannot resist an arrest pursuant to a warrant.

At trial, the State had the burden of proving that the arrest was lawful. It is undisputed that there was no warrant for

---

9. At oral argument, the State suggested that the master could hold a litigant for a reasonable time. Based on the record before us, there is little basis to conclude that the seizure here would have been for a "reasonable" time. The record does not reflect how long it ordinarily or actually takes to procure judicial review of the master's recommendation; the master commented only, other than the master's comment that her requests "gets [sic] done the same day." Howard County has only a few circuit judges, and we would have to speculate as to their availability at any given time. In any event, waiting in a cell for the day would hardly seem to qualify as a "brief" or "reasonable" detention. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) (permitting an investigative stop and frisk to verify or dispel the officer's reasonable, articulable suspicion of criminal activity). *See also Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.").

appellant's arrest. Nor did appellant commit a crime in the presence of the deputies before they approached him with handcuffs. Thus, the legitimacy of the arrest necessarily depends on: (1) the authority of the master, express or implied, to order the seizure of a litigant under the circumstances attendant here or (2) the comparability of the situation here to an arrest pursuant to a facially valid but defective warrant, founded upon the deputies' good faith belief as to the master's authority to order appellant's arrest. We shall consider first whether the master had the authority to arrest appellant.

## A.

■ We recently observed that "the authority of the master[ ] is limited by the Maryland Rules and the statutes providing for the use of masters in domestic relations cases." *Wise–Jones v. Jones,* 117 Md.App. 489, 499, 700 A.2d 852 (1997). This suggests that the master's authority must derive either from a statute or a rule. We look to Maryland Rules 9–207 and 2–541(c), which govern the powers of a domestic master. Pursuant to Rule 9–207(a)(1), matters of contempt for noncompliance are routinely referred by the clerk to a master "as of course," unless the circuit court directs otherwise. Rule 9–207(a)(1) specifically authorizes a master to preside at a hearing regarding contempt for noncompliance with an order relating to the payment of alimony or child support. Further, Maryland Rule 9–207(b) provides: "The master shall have the powers provided in Rule 2–541(c) and shall conduct the hearing as provided in Rule 2–541(d)." In turn, Maryland Rule 2–541(c), states, in part, that

a master *has the power to regulate all proceedings in the hearing,* including the powers to:

(1) Direct the issuance of a subpoena to compel the attendance of witnesses and the production of documents or other tangible things;

(2) Administer oaths to witnesses;

(3) Rule upon the admissibility of evidence;

(4) Examine witnesses;

(5) Convene, continue, and adjourn the hearing, as required;

(6) Recommend contempt proceedings or other sanctions to the court; and

(7) Make findings of fact and conclusions of law.

(Emphasis added).

It is patently clear that the rules do not grant express power to a domestic master to hold a litigant against his will after a non-support hearing,[10] although masters are authorized to conduct evidentiary hearings and to make findings of fact and recommendations to the circuit court. Indeed, even Master Patrick agreed that she lacked express authority to arrest appellant. The State is of the view, however, that the rules do not contain an exhaustive list of the master's powers. In addition to the explicit powers conferred by Rule 2–541(c), the State asserts that the rule implicitly includes the power to detain, because such power is inherent in the authority conferred upon a master to "regulate all proceedings" at a hearing. It thus posits that the master had implied authority, under Maryland Rule 2–541, to detain appellant for a reasonable period, pending judicial review of the master's recommendations. Therefore, we must determine if the phrase "regulate all proceedings," as used in Rule 2–541(c), confers upon the master the power to hold someone in custody pending judicial review of a master's recommendation for immediate incarceration.

 As we set about to interpret the rule, we must apply the same standards of construction that apply to the interpretation of a statute. *Long v. State*, 343 Md. 662, 667, 684 A.2d 445 (1996); *In re Victor B.*, 336 Md. 85, 94, 646 A.2d

---

**10.** This omission contrasts with the authority of a juvenile court master. Pursuant to Md.Code (1974, 1995 Repl.Vol.), § 3–813(d) of the Courts and Judicial Proceedings Article, a juvenile master is authorized to order the detention of a juvenile pending review of the master's recommendations by the circuit court.

1012 (1994); *Davis v. Goodman,* 117 Md.App. 378, 700 A.2d 798 (1997); *Kerpelman v. Smith, Somerville & Case, L.L.C.,* 115 Md.App. 353, 357–58, 693 A.2d 357, *cert. denied,* 346 Md. 241, 695 A.2d 1229 (1997); *Miller v. Bosley,* 113 Md.App. 381, 393, 688 A.2d 45 (1997). This requires that we ascertain the Court of Appeals's intent in promulgating the rule. *Davis,* 117 Md.App. at 399–400, 700 A.2d 798; *Morales v. Morales,* 111 Md.App. 628, 632, 683 A.2d 1124 (1996), *cert. denied,* 344 Md. 567, 688 A.2d 446 (1997); *Stach v. Stach,* 83 Md.App. 36, 40, 42, 573 A.2d 409 (1990). In order to accomplish this task, we are obligated to construe the words in the text in accordance with their ordinary and natural meaning. *Long,* 343 Md. at 667, 684 A.2d 445; *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012. Moreover, we must give effect to the rule as a whole, *Long,* 343 Md. at 667, 684 A.2d 445; *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012, and we are not to embellish a provision so as to enlarge its meaning. *See Blitz v. Beth Isaac Adas Israel Congregation,* 115 Md.App. 460, 480, 694 A.2d 107, *cert. granted,* 347 Md. 155, 699 A.2d 1169 (1997).

 If the rule is ambiguous, we may look to other sources in order to determine the Court of Appeals's intent. *Long,* 343 Md. at 667, 684 A.2d 445; *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012; *Leppo v. State Highway Admin.,* 330 Md. 416, 422, 624 A.2d 539 (1993). Even if the language of a rule is clear, we may consider extrinsic material that " 'fairly bears on the fundamental issue' " of the purpose or goal of the rule. *Stach,* 83 Md.App. at 42, 573 A.2d 409 (quoting *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987)). This is because "[o]ur mission is to give the rule a reasonable interpretation in tune with logic and common sense." *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012. Therefore, we may consider the history of a particular rule as an aid to determining the court's intent. *Long,* 343 Md. at 668, 684 A.2d 445; *Stach,* 83 Md.App. at 42, 573 A.2d 409.

 In construing the rule here, we are mindful of the principle that the expression of one thing is generally the exclusion of another. *Long,* 343 Md. at 666, 684 A.2d 445;

*Leppo,* 330 Md. at 423, 624 A.2d 539. On the other hand, the use of the word "including" suggests that the seven enumerated powers are not exclusive. "Ordinarily, the word 'including' means comprising by illustration and not by way of limitation." *Group Health Ass'n v. Blumenthal,* 295 Md. 104, 111, 453 A.2d 1198 (1983); *see also Carroll County v. Raymond I. Richardson Found., Inc.,* 71 Md.App. 434, 441, 526 A.2d 81 (1987). Nevertheless, the enumerated powers in Rule 2–541(c) are procedural, not substantive. To be sure, the power to arrest is substantive in nature.

We conclude that the rule does not implicitly confer upon the master the power to detain appellant pending judicial review of a master's recommendation. The construction of the rule urged by the State would engraft upon the rule a meaning not evident from the plain text and would be wholly inconsistent with the advisory, clerical, and ministerial functions that masters have traditionally performed. Construing the nature of the master's power under the rule as procedural also comports with the traditional functions of the master. We turn to examine the role of a master and his or her corresponding powers.

██ A master is not a judicial officer, and the Maryland Constitution does not vest a master with any judicial powers. *In re Anderson,* 272 Md. 85, 106, 321 A.2d 516 (1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975); *see also Swisher v. Brady,* 438 U.S. 204, 209, 98 S.Ct. 2699, 2703, 57 L.Ed.2d 705 (1978) ("masters [in Maryland] are entrusted with none of the judicial power of the State"); *Lemley v. Lemley,* 102 Md.App. 266, 277, 649 A.2d 1119 (1994) ("[T]he master is not a judge and is not vested with any part of the State's judicial power."); *Sensabaugh v. Gorday,* 90 Md.App. 379, 390, 600 A.2d 1204 (1992) ("Once a master has recommended a contempt proceeding it is necessary for the court to issue the show cause order because the master does not have the power to issue such orders."). "Simply put, the Master is a ministerial and not a judicial officer." *Levitt v.*

*Levitt,* 79 Md.App. 394, 399, 556 A.2d 1162, *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989).

In *Nnoli v. Nnoli,* 101 Md.App. 243, 646 A.2d 1021 (1994), we observed that a master has historically been an "adviser of the court as to matters of jurisdiction, parties, pleading, proof and in other respects where he may be of assistance to the court. . . . The duties of the master are of an advisory character only. He decides nothing, but merely reports to the court the result of his examination of the proceedings, with a suggestion as to the propriety of the court passing a decree."

*Id.* at 261 n.5, 646 A.2d 1021 (quoting Edgar G. Miller, Jr., *Equity Procedure* § 556, at 654–55 (1897)). Thus, a judge "may never delegate away a part of the decision making function to a master—a non-judicial officer." *Wenger v. Wenger,* 42 Md.App. 596, 602, 402 A.2d 94 (1979). Consequently, even when a judge defers to a master's fact-finding, the judge does not defer to the master's recommendation as to the appropriate course of action. *Id.* at 606, 402 A.2d 94; *see also Ellis v. Ellis,* 19 Md.App. 361, 365, 311 A.2d 428 (1973).

A master is, however, an officer of the court, appointed by the circuit court; that court has constitutional authority to make such appointments.[11] Md. Const. art. 4, § 9 ("The Judge, or Judges of any Court, may appoint such officers for their respective Courts as may be found necessary."); Md. Rule 2–541(a)(3) ("A master serves at the pleasure of the appointing court and is an officer of the court in which the referred matter is pending."). Nevertheless, a master's status

11. Attorneys, the court-appointed next friend for a minor, and a court-appointed investigator from the Department of Social Services have also been described as officers of the court. *See Kosmas v. State,* 316 Md. 587, 601, 560 A.2d 1137 (1989) (attorney); *Berrain v. Katzen,* 331 Md. 693, 703, 629 A.2d 707 (1993) (next friend); *Leary v. Leary,* 97 Md.App. 26, 49–50, 627 A.2d 30 (1993) (court-appointed investigator from Department of Social Services). *But see Tucker v. Woolery,* 99 Md.App. 295, 301, 637 A.2d 482 (equating "judicial officer" with "officer of the court" and holding that persons appointed by court as Special Masters and Trustees in a divorce action enjoyed qualified judicial immunity), *cert. denied,* 336 Md. 280, 648 A.2d 192 (1994).

as an "officer of the court" does not confer *judicial* powers upon the master, such as the authority to hold someone in contempt, to sign a warrant, or to order a police officer to make an arrest. Indeed, "[a] master is not the trial judge. A master does not replace her or him." *Wise–Jones*, 117 Md. App. at 500, 700 A.2d 852. Thus, only a judicial officer may issue a warrant. Md. Rule 4–212(d).[12] Because a master is not a judicial officer, and performs only ministerial functions, a construction of the rules that recognizes an implied power to order an arrest would run afoul of constitutional precepts.

*Stach* supports the kind of narrow interpretation of the rule that we adopt here. In *Stach*, after a hearing, the master recommended, *inter alia*, joint temporary legal custody, with physical custody to the mother, *pendente lite*. The father timely filed exceptions to the master's report and recommendations and requested a circuit court hearing. Prior to the hearing, on motion of the mother, the circuit court signed an immediate order adopting the recommendations.

This Court reversed the circuit court's award of *pendente lite* custody to the mother. We observed that Maryland Rule 2–541(g), concerning entry of an order implementing recommendations by a master, "contains no explicit authority for entry by the court of an immediate order under the circumstances presently before us." *Stach*, 83 Md.App. at 40, 573 A.2d 409. Of particular significance to us here, the *Stach* Court declined to expand the literal language of the rule,

---

12. Maryland Rule 4–212(d) provides:

 **(d) Warrant—Issuance.—**

 (1) *In the District Court.*—A judicial officer may, and upon request of the State's Attorney shall, issue a warrant for the arrest of the defendant, other than a corporation, upon a finding that there is probable cause to believe that the defendant committed the offense charged in the charging document. . . .

 (2) *In the Circuit Court.*—Upon the request of the State's Attorney, a warrant shall issue for the arrest of a defendant, other than a corporation, if an information has been filed against the defendant and the circuit court or the District Court has made a finding that there is probable cause to believe that the defendant committed the offense charged in the charging document or if an indictment has been filed against the defendant. . . .

which only authorized the circuit court to enter an immediate order in limited circumstances "specifically enumerated" in the rule. *Id.* at 42, 573 A.2d 409. As a *pendente lite* award of custody was not so enumerated, we refused to uphold the chancellor's action in signing an immediate order implementing all of the master's recommendations, without first holding a hearing. *Id.* at 43, 573 A.2d 409. In reaching that conclusion, we were also persuaded by the "legislative history" that the rule did not confer by implication the power in issue. We thus invoked the principle that "the [Maryland] Rules are not guides to the practice of law but precise rubrics established to promote the orderly and efficient administration of justice." *Id.* at 41, 573 A.2d 409.

In much the same way as the *Stach* Court, we shall strictly interpret Rule 2–541(c). Because the rule does not provide express authority to the master to arrest a litigant pending judicial review of the master's recommendations, we decline to expand the rule to authorize such power by implication.[13]

Because the *Stach* Court decided the appeal in favor of appellant based upon principles of statutory construction, it did not resolve appellant's contentions that the circuit court's entry of the order was an unconstitutional delegation of authority to the master, which denied appellant due process of law. The *Stach* decision, however, "alerted the Court of Appeals to the 'constitutional infirmities that may lurk beneath the surface of Rule 2–541.'" *Morales,* 111 Md.App. at 631, 683 A.2d 1124 (quoting Reporter's Note to Rule S74A, 18 Md. Reg. 679 (March 22, 1991)). As a result, the Court of Appeals revisited former Rule S74A to provide "a delicate balance between the need for expediency in domestic cases and the rights of domestic litigants to receive due process of law." *Morales,* 111 Md.App. at 631, 683 A.2d 1124. The revisions included a streamlined process in which the master

---

**13.** Our statement should not be construed to suggest that we believe the power of arrest can be conferred through the rule-making process. In that event, serious constitutional questions would arise. We note, by way of contrast, that the juvenile master's detention power is conferred by the Legislature, not by rule. *See supra* note 10.

is required to file written recommendations within three days of the hearing. Upon receipt of notice of the recommendation, either orally at the hearing or in writing, but whichever is earlier, the parties must file exceptions within five days. *Id.* at 632–33, 683 A.2d 1124; *see also Miller,* 113 Md.App. at 391–93, 688 A.2d 45.

Under Maryland Rule 9–207(f)(1), a circuit court generally may not enter an order based upon a master's recommendations until either the time for filing exceptions has expired or, if exceptions have been filed, until the court has ruled on the exceptions. There are two limitations, however. Maryland Rule 9–207(f)(2) provides that, in *pendente lite* matters, if the master finds that "extraordinary circumstances" exist, the court may direct the entry of an immediate order after reviewing the file or exhibits. Such an order "remains subject to a later determination by the court on exceptions." *Id.* The second exception concerns contempt, authorizing the court to hold a hearing and enter an order of contempt "at any time." Md. Rule 9–207(f)(3). This provision does not have the limitation that it is subject to later rulings on exceptions. Nevertheless, Master Patrick's recommendations of contempt and immediate incarceration clearly were not self-executing. Rather, they were subject to review and implementation by a judge of the circuit court. *Domingues v. Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133 (1991); *In re Darryl D.,* 308 Md. 475, 477 n.2, 520 A.2d 712 (1987); *see also* Md. Rule 9–207; *cf. Caldor, Inc. v. Bowden,* 330 Md. 632, 658, 625 A.2d 959 (1993) (construing Md. Rule 911 with respect to juvenile masters).

The broad construction of the rule urged upon us by the State is also contrary to the history of the rule. Our review of the minutes from the Court of Appeals Standing Committee on Rules of Practice and Procedure indicates that the Committee was concerned about an unconstitutional delegation of judicial power to domestic masters. At its meeting on April 22, 1977, the Committee discussed Rule 596, the predecessor to Rule 2–541. It considered Judge William McCullough's

letter to the Reporter dated March 10, 1977, suggesting "the amendment and enlargement of section g.1 (Time of Entry of Order—Immediate Order) to permit entry of immediate orders in other than *pendente lite* cases, including contempt." *Minutes from the Court of Appeals Standing Committee on Rules of Practice and Procedure* 3–4 (April 22, 1977). The proposed section g.1 provided:

g. *Time of Entry of Order.*

1. *Immediate. Order.*

*Subject to the later determination of the court on any exceptions, an order implementing the recommendation of a Master*

*(i) shall be entered immediately in accordance with a recommendation that alimony or child support be awarded, pendente lite, accounting from the date recommended by the Master; and*

*(ii) may be entered immediately, effective as of the date of the order, in accordance with a recommendation that visitation of minor children be awarded pendente lite, or that an existing decree or order be modified as to child visitation.*

The minutes also reflect the following debate concerning Judge McCullough's suggestion:

Mr. [now Judge] Rodowsky stated that he believed Judge McCullough's ... point was well taken, with respect to immediate orders, and that he proposed inclusion in the second line of subsection g. 1(ii) following "order,", the words "upon a master's determination of contempt,".

*Mr. Myerberg stated that such an amendment would raise a serious constitutional question, and that he believed it unconstitutional for a master to hold a party in contempt.* Masters in Baltimore City have no such power.

Mr. Owens and Judge McAuliffe agreed that in Montgomery County masters have no power to hold a party in contempt.

Mr. Myerberg asked how a master could hold a party in contempt of an immediate order, if the party had ten days within which to except to the master's report?

\* \* \* \*

*Mr. Myerberg stated that masters should have no jurisdiction in either custody or contempt matters, that these issues were too important to allow masters to determine them. The Chairman concurred that masters should not handle contempt matters.*

Judge Ross stated that in Baltimore City, Lucy Garvey had been handling contempt matters for years, and that it works well. He acknowledged, however, that although the master determines *prima facie* that a party is in contempt, a judge actually signs the order.

Judge McAuliffe thereupon moved the deletion of subsection c. 4,[14] and the motion was seconded. The Chairman called for a vote, and the motion carried on a vote of eight for to six against.

Mr. Myerberg acknowledged that the impact of deleting contempt from a master's jurisdiction will be tremendous, as it will throw back many cases onto judges, and will only delay civil cases further. He reiterated his opinion, however, that it was simply not justice to allow a master to determine contempt.

---

**14.** The section provided:

*c. Referral as of Course.*

*In a court in which there is a Standing Master, the following proceedings, in which a hearing is requested, shall be referred as of course to a Standing Master for hearing, unless the court otherwise directs in a specific case:*

\* \* \* \*

*4. Determination of contempt by reason of non-compliance with a decree or order relating to alimony, support and maintenance of a spouse or the custody, visitation, or support of children, following service of a show cause order or upon the attachment of the accused.*

This material now appears in Maryland Rule 9–207(a)(1)(F), (G).

■■■■■■■■■■

\* \* \* \*

Mr. Rodowsky stated that the issue should probably be restated; *should the determination of contempt be heard only by a judge, or initially by a master, and be heard by a judge only on exception taken to the master's determination?*

There being several suggestions for a recount of the vote on Judge McAuliffe's motion to delete subsection c. 4, the Chairman called for a recount, which resulted in a vote of four for deletion to 10 against deletion, thereby reversing the prior result.

Judge Ross suggested that the proposed rule be referred back to the Subcommittee to draft a further amendment to subsection g. 1(ii), or the possible addition of a new subsection g. 1(iii) to provide for an immediate hearing on a master's citation for contempt, so as to negate that a party has ten days to file exceptions, and thus cannot immediately be held in contempt. After some further discussion, the proposed rule was referred back to the Subcommittee for the drafting of an amendment as suggested by Judge Ross.

*Minutes from the Court of Appeals Standing Committee on Rules of Practice and Procedure* 6–8 (April 22, 1977) (emphasis added).

At a subsequent meeting, the Committee approved a new subsection, then denominated Rule 596(g)(2). It provided: " 'A hearing on a recommendation by a master that an individual be found in contempt may be held by the court at any time'." *Minutes from the Court of Appeals Standing Committee on Rules of Practice and Procedure* 4 (November 19, 1977). Substantially similar language now appears in Maryland Rule 9–207(f)(3), to which we have already referred.

As the master lacked the authority to arrest appellant, we must next resolve whether the master's directive was the legal equivalent of an invalid warrant, so as to foreclose appellant's right to use any force in resisting the arrest.

## B.

At trial, the State argued that the arrest should be treated as an arrest pursuant to a warrant. The trial court agreed, stating:

Well, it appears to me that ... this is the situation that is most closely analogous to the arrest under a warrant and that you have an officer acting under the direct authority of ... a judicial officer or someone else who he is suppose[d] to take instructions, versus a situation where an officer can make an arrest just based on observations, and that, I think, would be the appropriate law given that everybody agrees there's nothing exactly on point to the circumstances of this case.

Having analogized the arrest to one made pursuant to a warrant, the judge then determined that appellant had no right whatsoever to use force to resist. Accordingly, she refused to instruct the jury with regard to one's right to resist an illegal, warrantless arrest. The judge also declined appellant's request to permit the jury to resolve the legal question of whether a master has the power or authority to arrest a litigant under the circumstances of this case.[15]

---

**15.** This issue was not pressed on appeal. We note, however, that Article 23 of the Maryland Declaration of Rights currently provides: "In the trial of all criminal cases, the jury shall be the Judges of Law, as well as fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." To be sure, Article 23 "does not mean precisely what it seems to say." *Brady v. Maryland*, 373 U.S. 83, 89, 83 S.Ct. 1194, 1198, 10 L.Ed.2d 215 (1963). Indeed, the jury is not empowered to resolve all disputes "under the generic label—'law.'" *Stevenson v. State*, 289 Md. 167, 178, 423 A.2d 558 (1980); *see also In re Petition for Writ of Prohibition*, 312 Md. 280, 318, 539 A.2d 664 (1988). Nevertheless, the jury's role continues to extend to the resolution of "conflicting interpretations of the law of the crime and determining whether that law should be applied in dubious factual situations." *Hebron v. State*, 331 Md. 219, 233, 627 A.2d 1029 (1993); *see also Barnhard v. State*, 325 Md. 602, 614, 602 A.2d 701 (1992) (stating that, "under current law if there is *no sound basis for a dispute as to the law of the crime*, the court's instructions are binding on both the jury and counsel" (emphasis in original)); *Montgomery v. State*, 292 Md. 84, 89, 437 A.2d 654 (1981) (holding that jury is entitled to decide the law

In urging us to uphold the trial court's ruling, the State asserts that, even if the master lacked the authority to detain appellant pending judicial review of her recommendations, the arrest was legal because the deputies were entitled to rely, in good faith, upon the master's apparent authority to order appellant's detention, just as an officer is entitled to rely upon a facially valid but defective warrant. Therefore, the State contends that the trial court was correct in treating the warrantless arrest like an arrest pursuant to an invalid warrant, thereby foreclosing appellant's right to resist. Relying on *Rodgers*, 280 Md. at 418–19, 373 A.2d 944, in which the Court of Appeals distinguished an arrest based on a defective warrant from an arrest based on an officer's observation of a crime, the State asserts:

> Even assuming . . . that Master Patrick did not have the authority to order Wiegmann arrested or detained, Wiegmann was still not entitled to resist the arrest, pursuant to the reasoning of *Rodgers*. Just as an officer cannot be expected to make a judgment as to whether every arrest warrant contains any fatal defect or irregularity . . . a officer cannot be required to make distinctions regarding when a master's order to detain a person is lawful or not.

In *Rodgers*, the Court of Appeals reasoned that, with regard to a warrant, an officer is simply obeying a court order. The Court explained:

> [T]he officer engaged in carrying out the mandate of a court that he arrest an individual named in a warrant is blameless if that warrant has been issued in error, and it would be a betrayal of our duty to such an officer to say that the citizen is entitled to inflict injury on the officer because the courts had erred in issuing the warrant. Indeed, to sanction resistance to arrest under these circumstances would be to invite the very destruction of the entire judicial process, for we would then impose upon every police officer commanded by a warrant to make an arrest the duty to make his own

---

when there is "a dispute as to the proper interpretation of the law of the crime for which there is a *sound basis*" (emphasis in original)).

independent judgment as to whether the judicial officer had properly performed his duty in issuing the warrant. Such a practice would make a mockery of the courts and place an impossible burden on police officers, who, however well trained in the performance of their police duties, cannot be expected to have sufficient training in the law to make a reasoned judgment as to whether the face of every arrest warrant contains any fatal defect or irregularity.

*Id.* at 419, 373 A.2d 944. Thus, the Court of Appeals concluded that an individual cannot lawfully resist an arrest pursuant to a warrant. It said:

[W]e can think of nothing more appropriate or more fundamentally fair than that the arrested person seek redress for his wrongs in court, rather than be seeking to do violence to the person of the court's innocent emissary.

*Id.*

In our view, the circuit court erred in equating appellant's warrantless arrest, which was based on an unlawful order of a master, with an arrest pursuant to a flawed warrant issued by a judicial officer. A judicially authorized warrant is the cornerstone of the Fourth Amendment, and analogizing the situation in the case *sub judice* to an arrest pursuant to an invalid warrant denigrates the importance of the warrant to our constitutional framework. One may question a peace officer who is acting according to his or her own discretion. During the course of the execution of a warrant, however, one may not challenge the warrant, because it is based upon the considered judgment of a judicial officer and it is memorialized in a written document.

In the context of this case, the good faith belief and conduct of the deputies could not transform an illegal arrest into a legal one. The deputies simply were not "carrying out the mandate" of the circuit court merely because they reasonably believed the master was a judicial officer. *Rodgers,* 280 Md. at 419, 373 A.2d 944. Absent a warrant, "simple good faith on the part of the arresting officer is not enough. . . . If subjective good faith alone were the test, the protections of the

Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (citations and quotations omitted). As the master had no right to order appellant's arrest, his arrest by the deputies was not the equivalent of an arrest pursuant to a warrant. To the contrary, it was illegal.

We next consider appellant's challenge to the trial court's refusal to instruct the jury regarding the conditions under which a person is entitled to resist an arrest.

## III.

The defense asked the court to instruct the jury concerning the right to resist an arrest. This request was rejected. We are amply satisfied that the court erred in failing to give an instruction consistent with the request.

We are guided by what the Court said in *Jenkins* with respect to resisting arrest, as well as other cases that we previously cited. In *Jenkins*, the Court said:

> The common law rule adhered to in this State is that a person illegally arrested by a police officer [without a warrant] may use any reasonable means to effect his escape to the extent of using such force as is reasonably necessary under the circumstances. On the other hand, the authorities generally hold that one threatened with an illegal arrest may not use excessive force in resisting such arrest and if he does he himself may be charged with an unlawful assault.

232 Md. at 534, 194 A.2d 618 (citations omitted).

Wiegmann was entitled to rely on the clearly delineated principle that he had the right to use reasonable force to resist an illegal arrest that was not supported by the authority of a warrant. As we noted, the court refused to instruct the jury that an individual has the right to use that degree of force reasonably necessary to resist an illegal, warrantless arrest. Instead, the court instructed the jury as follows:

The Defendant is charged with the crime of resisting arrest. In order to convict the Defendant of resisting arrest the State must prove that a law enforcement officer attempted to arrest the Defendant, two, that the Defendant knew that a law enforcement officer was attempting to arrest him, and three that the Defendant refused to submit to the arrest and resisted the arrest by force.

██ Maryland Rule 4–325(c) provides that if a party requests an instruction that correctly states the applicable law generated by the evidence, which has not been covered in the instructions already given, the trial court is required to give the instruction. *See State v. Martin,* 329 Md. 351, 357, 619 A.2d 992, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Sims v. State,* 319 Md. 540, 550, 573 A.2d 1317 (1990); *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). Because appellant was illegally arrested, he was entitled to an instruction as to the privilege to use reasonable force to resist an unlawful arrest. Had the jury been so instructed, it may have concluded that appellant used reasonable force to resist; it follows that if he used reasonable force, appellant would not have committed a battery.

██ Although the jury acquitted appellant with respect to the resisting arrest charge, the court's error as to the instructions is not one that we can overlook or deem harmless. The omitted instruction concerning the right to resist an unlawful arrest may well have infected the jury's evaluation of the battery charge, as the right to use reasonable force to resist an illegal arrest is inextricably related to the resulting battery. It is readily apparent that if appellant used only reasonable force to resist the illegal arrest, then he did not commit a battery.

Because appellant did not receive an instruction to which he was entitled, appellant's conviction for battery cannot stand. Therefore, we shall vacate his conviction and remand for further proceedings. On remand, the jury should be instructed that the arrest was illegal and that appellant had the right to use reasonable force to resist an unlawful arrest. The sole

unanswered question is whether appellant resorted to the use of reasonable or excessive force.

### Conclusion

We recognize that masters serve a vital if not indispensable role in the adjudication of domestic disputes, particularly in view of the ever growing domestic docket. Indeed, "[i]n the interest of conserving valuable judicial resources, much laborious and time-consuming fact-finding has traditionally been carried out in the equity courts by masters...." *Wenger*, 42 Md.App. at 603, 402 A.2d 94. Consequently, as we acknowledged in *Ellis*, 19 Md.App. at 365, 311 A.2d 428, the use of masters "undoubtedly has salutary effects resulting in the more expeditious dispatch by the judicial process...." Nevertheless, the master system is not a perfect system and, on occasion, the relationship between master and judge is "troubled". *Lemley*, 102 Md.App. at 277, 649 A.2d 1119. This case highlights some of those troubles, flowing from our increasing reliance on domestic masters.

Master Patrick claimed that appellant had previously been incarcerated as a result of his domestic problems, he lived in Georgia, he appeared subject to a cash only bond, and she thought he had previously fled from a courtroom on another occasion. She was therefore apprehensive that appellant would flee before the circuit court ever had a chance to consider her recommendations. Apparently, there was no screening process in place that would have alerted the appropriate persons to the master's concerns. We are left to wonder why this case was assigned to a master in the first place, in view of the master's concerns. Surely, under these circumstances, the better practice would have been to bypass the master altogether and assign the case directly to a judge. In this regard, we are reminded of what the Court of Appeals said in *Domingues*, albeit in a different context:

Although the use of masters has proven beneficial in a variety of cases, the question of the advisability of referring contested custody cases to a master in those instances where the trial court has discretion to do so, is one that

should be carefully considered. If a chancellor must essentially duplicate the effort and dedication of time of a master in order to ultimately decide a case, nothing has been gained by referral to the master. On the other hand, if, because of the expertise of the master, or for other reasons, parties often accept the recommendation of the master and exceptions are infrequently filed, the use of a master may be advisable.

*Domingues,* 323 Md. at 497, 593 A.2d 1133 (footnote omitted).

JUDGMENT OF CONVICTION VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. HOWARD COUNTY TO PAY COSTS.

MURPHY, C.J., dissents.

MURPHY, Chief Judge, dissenting.

If it is true that appellant had a right to resist the arrest at issue in this case, public policy requires a change in the applicable law. In this day and age, no person should have the right to resist an arrest made by a uniformed law enforcement officer. When the arrest is made by a uniformed deputy sheriff in the hearing room of a courthouse, the arrested person should not have the first call on the issue of whether that arrest was illegal. I am persuaded, however, that there are two reasons why appellant's conviction should be affirmed.

## I

Rule 9–207(f)(3) authorizes the master to request immediate judicial action on his or her recommendation that a person be found in contempt. Rule 2–541(c) expressly provides that the master's "power to regulate all proceedings in the hearing" includes the power to "continue, and adjourn the hearing, as required." If he or she concludes that the contemptuous refusal to pay child support is so serious that a judge should "immediately" (1) order that the contemptnor be confined, and (2) establish a purge provision, the master is expressly autho-

rized to declare a recess in order to make such a recommendation to a circuit court judge. That is precisely what occurred in this case.[1]

The narrow question before us is whether appellant was free to walk out of the courthouse while the master was looking for a judge to consider her recommendation.[2] Only if appellant was free to leave the hearing room immediately did he have the right to use the force that he used against the deputies. In my opinion, under the applicable rules (1) appellant had no such right, (2) the master was empowered by implication to order that appellant be detained for a brief period of time while she attempted to obtain judicial action on her recommendation, and (3) the deputies were obliged to take appellant into custody pursuant to the master's announced intention "to recommend that the incarceration be immediate from the courtroom, and that an immediate Order be entered."

## II

It has long been the law in Maryland that the validity of an arrest depends upon whether the officer had probable cause to arrest, not whether the officer articulated the correct basis for the arrest.

*Dennis v. State,* 345 Md. 649, 658 n. 3, 693 A.2d 1150 (1997) (Raker, J., dissenting). Even if the master had no authority to order that appellant be arrested, (1) a deputy sheriff has the power of arrest, (2) contempt of court is a criminal offense, and (3) both contempt of court and the misdemeanor pro-

---

1. It is inconsequential that no recess was ever formally "declared." Appellant interrupted the master, and fought with the deputies, as soon as the master announced her intention to request immediate judicial action.

2. While this case does not present the question of how long a person can be detained while the master is attempting to obtain judicial action on a recommendation for confinement, or the question of where the person should be detained during that period of time, I disagree with the majority's comment that there is "little basis" to conclude that appellant's detention would have been brief or reasonable. In my opinion, there is no basis for concluding otherwise.

scribed by Section 10–203 of the Family Law Article are offenses of a continuing nature. In this case, the master's announcement of her intention "to recommend that the incarceration be immediate from the courtroom, and that an immediate Order be entered," supplied the deputies with probable cause to arrest appellant for either or both of those offenses. Appellant's arrest was therefore lawful under Art. 27, Sec. 594B(b).

### Proceedings on Remand

This case should not be remanded. As the majority has decided to do so, however, the State should now be afforded "the opportunity to prove the legality of (appellant's) arrest ... without reliance on the [authority of the master]." *Collins v. State*, 17 Md.App. 376, 385, 302 A.2d 693 (1973). In that case, we reversed a possession of heroin conviction because the contraband introduced into evidence against the appellant had been seized from his person under the authority of a warrant that had been issued on the basis of an affidavit that "could not support a finding of probable cause." *Id.* at 383, 302 A.2d 693. Chief Judge Orth explained why a remand was necessary:

> Our holding that the arrest warrant was invalid, and the arrest, as made under its authority, was illegal, does not end our inquiry ... It is the existence of probable cause at the time of the arrest which is the measure of the legality of the arrest. *Evans v. State*, 11 Md.App. 451 [274 A.2d 653]. Probable cause may be based on information collectively within the knowledge of the police. *Hebron v. State*, 13 Md.App. 134 [281 A.2d 547]. So even when an officer acting on a direction to arrest was personally without sufficient probable cause to justify the arrest, it may be shown that information within the knowledge of the police team constituted probable cause. *Thompson v. State*, 15 Md.App. 335 [290 A.2d 565]. In such case, of course, the State is required to produce the evidence on which the officers initiating the arrest acted ...

... Although it is patent from the transcript of the trial on the merits that the conviction of Collins was predicated solely on the heroin recovered from his person, we shall remand the case for a new trial. The State may be able to show that there existed probable cause for a warrantless arrest of Collins ... In other words, on retrial the State has the opportunity to prove the legality of the arrest of Collins without reliance on the warrant, ... The legality of a warrantless arrest would be proved by showing that the police had facts and circumstances within their knowledge or reasonably trustworthy information thereof, sufficient to warrant a reasonably cautious [person] in believing that Collins had (committed the offense for which the warrant was issued).

*Id.* at 383–85, 302 A.2d 693. That holding is applicable here. If the record of this case does not now support the conclusion that appellant's arrest was lawful under Art. 27, Sec. 594B(b), there is no valid reason why the State should be denied the right to present additional evidence on that issue.